UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| CAREY BRABSON, | )<br>) |
| Plaintiff, | )<br>)   Civil No. 10-159-ART<br>) |
| v. | )<br>) |
| FLOYD COUNTY BOARD OF EDUCATION, et al., | )   **MEMORANDUM OPINION**<br>)   **& ORDER**<br>)<br>) |
| Defendants. | )<br>) |

\*\*\* \*\*\* \*\*\* \*\*\*

Where does government end and business begin? Plaintiff Carey Brabson believes that a board of education acts like a business when it opens the schoolhouse gates to an outside group for its own use. But the Floyd County Board of Education did not expect or realize any profit when it allowed the parents of a self-funded, school sports team to conduct a fundraiser on school property. By providing a space for the parents to raise revenue, the Board directly furthered interscholastic athletics as part of its educational mission. As a result, the Board is entitled to governmental immunity and Brabson may not proceed with her lawsuit.

**BACKGROUND**

Like many other privately owned companies throughout Kentucky, Patterson Dep., R. 29 at 43, Cheer Elite organizes and hosts private cheerleading competitions, *id.* at 9–10, 13–14. Unlike interscholastic competitions associated with the Kentucky High School Athletics Association, Cheer Elite's competitions include both school teams and private all-

star teams, and each team must pay a fee to participate. *Id.* at 23, 35. Its owner, Sherri Patterson, usually holds these competitions at high schools or convention centers. *Id.* at 14. When Cheer Elite uses a convention center, it must pay a rental fee but gets to keep all of the competition's admission fees. *Id.* at 24.

In February 2010, Patterson needed to reduce her overhead expenses for the competition, so she decided to host it at a high school. Ousley Dep., R. 30 at 28. She approached Leslie Ousley—a guidance counselor and the cheerleading coach at Prestonsburg High School—about using the high school's gymnasium as the competition venue. *Id.* at 28. In exchange, the parents of the Prestonsburg High School cheerleaders, who were informally organized as the team's Boosters Club, would receive one-half of the admission fees. Patterson Dep., R. 29 at 68–69; Ousley Dep., R. 30 at 31–32, 34. Consistent with the Board's policy for approving the use of school property by outside groups, Principal Ted George approved the use of the school gymnasium. Ousley Dep., R. 30 at 42–43; Hammonds Dep., R. 52 at 10.

The Prestonsburg High School cheerleaders were fortunate that fundraising opportunities like this one came along. After all, the cheerleading team did not receive any funding, uniforms, or other supplies from the Board besides the occasional use of school buses at cost (the Boosters Club would pay for the fuel). *Id.* at 8, 12–13; Nunnery Dep., R. 51 at 12–14. Much like any private cheerleading club, it was up to the parents to fully finance the team. Hammonds Dep., R. 52 at 12–14. So the parents' portion of the admission fees from the Cheer Elite competition would go towards the cheerleaders' uniforms, travel expenses, and competition fees. Ousley Dep., R. 30 at 41.

2

Of course, a good plan means little without a successful execution. And the Cheer Elite competition was well-executed. Twenty teams participated in the competition, seven of which were school-affiliated and thirteen of which were private all-star teams. Patterson Dep., R. 29 at 38–39. Like the rest of the competitions that Cheer Elite hosts, each participating cheerleader had to pay a registration fee of $20.00 to $25.00. *Id.* at 20, 35. Cheer Elite also charged each audience member $5.00 to $8.00 as an admission fee. *Id.* at 35. Under its agreement with Cheer Elite, the Boosters Club received half of these admission fees as well as all of the revenue from its own concessions and merchandise sales. *Id.* at 25; Ousley Dep., R. 30 at 31–32, 34; Second George Aff., R. 38-1 at 1. Besides two school custodians paid by the Boosters Club, only the parents and Cheer Elite ran this competition; no school personnel were present. Hammonds Dep., R. 52 at 11.

The competition's financial success, however, is the bright side of this story. Like many other mothers in attendance, Carey Brabson was eager to see her daughter compete at Cheer Elite's competition. R. 17-1 at 1. Unaware of the raised gymnasium floor, Brabson tripped over the floor's edge and injured her right knee and left ankle. *Id.* at 2. She alleges that these injuries have caused her to miss over a year of work, endure three surgeries, and incur over $65,000 in medical expenses. *Id.* at 1.

On December 22, 2010, Brabson sued the Floyd County Board of Education and Patterson. R. 1. She alleges that these defendants failed to warn invitees and licensees (such as herself) about the dangerous and unsafe condition that caused her injuries. Compl., R. 1 at 2–3. Brabson also filed a claim against the Board of Education in the Kentucky Board of Claims. R. 14-1. The Board responded with a motion to dismiss this lawsuit, claiming that it was entitled to governmental immunity. R. 14. The Court denied that motion because the

3

Board did not provide enough information to show that it was entitled to immunity. R. 21 at 5.

With the benefit of discovery, the Board moved for summary judgment, again claiming governmental immunity. R. 31. Patterson also moved for summary judgment, contending that she was not the possessor of the school gymnasium and that the tripping hazard was open and obvious. R. 39. The Court granted Patterson's motion for summary judgment on the former grounds, R. 50 at 3, but the Court could not decide the Board's motion for summary judgment without additional information about the relationship between the Board and the Boosters Club, *see* R. 45. With the agreement of the parties, the Court ordered the parties to take limited deposition testimony and file supplemental briefing on this factual issue. R. 49. The Board's motion is now ripe for consideration.

## DISCUSSION

American government has a long history of making its property available for the public and outside groups to use. For example, public streets and parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) ((quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939)). Public schools and libraries joined in this tradition once public education evolved beyond the one-room schoolhouse. *See* 5 A Cyclopedia of Education 260–67 (Paul Monroe ed., 1913) (describing the development of schools as civic centers for the use of community groups outside of school hours). After all, schools were "accessible, often had gymnasiums, were seldom used in the evening, and were presumably run by and for the people." David V. Mollenhoff, Madison: A History of the

4

Formative Years 382 (2d ed. 2003); *see also* Kentucky Heritage Council, *A Historic Context of the New Deal in East Kentucky*, *1933 to 1943*, at 130 (2005), *available at* http://heritage.ky.gov/nr/rdonlyres/f142a86e-19c0-4ffd-8097-09474f37c9ef/0/newdealbuilds.pdf ("The [school] buildings were also meant to serve as community centers through utilization of the cafeteria and gymnasium for entertainment purposes, and classroom space for adult education programs.").

Filling this same governmental role, the Board in this case made one of its school's gymnasiums available to the parents of its cheerleading team so that they could conduct a fundraiser. And as a state agency, the Board's choice to do so entitles it to governmental immunity from Brabson's tort claims. *See Grayson Cnty. Bd. of Educ. v. Casey*, 157 S.W.3d 201, 202–03 (Ky. 2005) (citing *Schwindel v. Meade Cnty.*, 113 S.W.3d 159, 168 (Ky. 2003)).

Under the doctrine of governmental immunity, a state agency is liable only for damages caused by its tortious performance of a *proprietary* function—not those caused by its tortious performance of a *governmental* function. *Id.* Like many distinctions born from common-law decision-making, it can be difficult to neatly separate borderline cases into either category. And it is especially difficult to do so when the distinction itself is not based on a well-settled observation about the world around us, such as the difference between positive and negative numbers, but instead reflects a more controversial subject, such as the role of government.

To make this task more manageable, Kentucky courts have provided some guidelines. Governmental functions involve acts that are "integral" to or "paradigmatic of" government. *Crittenden Cnty. Bd. of Educ. v. Hargis*, No. 2009-CA-1673-MR, 2011 WL 474811, at *2 (Ky. Ct. App. Jan. 21, 2011) (quoting *Breathitt Cnty. Bd. of Educ. v. Prater*, 292 S.W.3d

5

883, 887 (Ky. 2009)); *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage*, 286 S.W.3d 790, 799 (Ky. 2009). By contrast, proprietary functions involve "undertakings of a sort [that] private persons or businesses might engage in for profit," especially if done with the purpose of raising revenue or participating in a commercial market. *Prater*, 292 S.W.3d at 887–88.

Here, the Board engaged in not just one but two governmental functions. First, the Board acted in "direct furtherance of education." *Letcher Cnty. Bd. of Educ. v. Tackett*, 2011 WL 4861128, at *2 (Ky. App. Oct. 14, 2011) (citing *Breathitt Cnty. Bd. of Educ.*, 292 S.W.3d at 887)). By allowing the Boosters Club—the sole source of funding for the cheerleading team—to conduct a fundraiser on school property, the Board fostered interscholastic athletics. *See Yanero v. Davis*, 65 S.W.3d 510, 527–28 (Ky. 2001) (holding that authorizing and conducting interscholastic athletics is part of the governmental function of public education); *Schwindel*, 113 S.W.3d at 168 (holding that hosting interscholastic sports in a public park is a governmental function). Second, the Board also continued a tradition of making government property available for use by the Boosters Club on a not-for-profit basis. *See supra* p. 4.

Moreover, this case threatens precisely the sort of concerns that lie at the core of governmental immunity. Governmental immunity prevents courts from "pass[ing] judgment on policy decisions made by members of coordinate branches of government in the context of tort actions" because tort actions "furnish an inadequate crucible for testing the merits of social, political or economic policy." *Tackett*, 2011 WL 4861128, at *2; *see also Yanero*, 65 S.W.2d at 521 (noting that the doctrine prevents state agencies from "having to answer for their [governmental] decisions in the context of tort litigation"). A judgment on the Board's

liability would thrust the Board's budgeting policy into the judicial spotlight. After all, finding the Board liable would be equivalent to overriding the Board's policy decisions about how to allocate its limited financial resources among its schools and requiring the Board to maintain, repair, or renovate certain schools at the expense of others. The order of the Board's economic priorities about which of its school properties should be renovated and when to do so is best left to the Board. *Cf. Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (discussing how a federal agency is "far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities" involved in allocating its funds from a lump-sum appropriation to its various programs (quoting *Heckler v. Chaney*, 370 U.S. 821, 831–32 (1985))).

Brabson, however, points out an opposing concern. She argues that granting the Board immunity would give it an "unfair competitive advantage" over private venues because state agencies could provide similar services "without the same costs and risks inherent in commercial enterprise." *Young*, 2008 WL 2779902, at *5 (quoting *Yanero*, 65 S.W.2d at 521). Indeed, Brabson says, there is evidence in this case that Cheer Elite switched from the Pikeville Expo Center to the Prestonsburg High School gymnasium because the latter was less expensive. *See* R. 54 at 5. Perhaps so. But the Kentucky Supreme Court rejected a similar argument in *Withers v. Univ. of Ky.*, 939 S.W.2d 340, 343 (Ky. 1997). There, the plaintiffs sued the University of Kentucky for wrongful death caused by the negligence of the decedent's physicians at the University of Kentucky Medical Center. *Id.* Trying to cast the Medical Center as a proprietary venture, the plaintiffs argued that it is "nothing more than a hospital" that competes with and "performs the same function as private hospitals." *Id.* The Kentucky Supreme Court rejected this argument because the

7

Medical Center's operation was "essential to the teaching and research function of the medical school." *Id.* Likewise, it is not enough that the Board's choice to make its property available for use by outside groups might compete with for-profit venues; this fact is true whenever government and business occupy overlapping roles in society. Because the Board was facilitating the parents' efforts to self-fund the cheerleading team, the Board was furthering the governmental function of facilitating interscholastic athletics.

Brabson also offers a different characterization of the relationship between the Board and the Boosters Club. The cheerleading parents who profited from the fundraiser, she argues, are an arm of the Board. From this premise, Brabson concludes that the Boosters Club's fundraising should be attributed to the Board and that the Board thus engaged in a proprietary function. *See* R. 54 at 3. Of course, a state agency's conduct slides towards the proprietary end of the spectrum when it receives a tangible benefit. *See, e.g.*, *Brewer v. Sheco Constr. Co.*, 327 F. Supp. 1017, 1019 (W.D. Ky. 1971) (noting that the Tennessee Valley Authority's construction of a new power substation for its sale of electrical energy was "more closely akin to its work in the commercial field" than its governmental function). But all of the available evidence in this case shows that the Board and the Boosters Club are entirely separate entities. The Boosters Club is not a formal school organization, and no school official oversaw its formation or operation. Hammonds Dep., R. 52 at 7–9, 18–19. The Prestonsburg High School cheerleading parents created this informal club as a way of pooling their fundraising efforts to finance the cheerleading team—an activity that the Board does not fund at all. There is only a single, limited link between the Board and the Boosters Club: Coach Ousley. The Board pays Ousley a small stipend to coach the cheerleading team, and she also occasionally participates in the Boosters Club's meetings. There is no evidence,

8

however, that the Board required or directed Ousley to work with the Boosters Club. Indeed, she did so voluntarily and offered only recommendations, not oversight. *See* R. 54 at 2; Hammonds Dep., R. 52 at 12, 21.

Further, the Board did not directly or indirectly receive anything in exchange for making the gymnasium available. The Board did not charge the Boosters Club or Cheer Elite for using the gymnasium. *Cf. City of Hopskinsville v. Burchett*, 254 S.W.2d 333, 334 (Ky. 1953) (holding that a municipal cemetery's sale of burial lots constituted a proprietary function). The Board did not receive any of the money raised by the Boosters Club, *see* Hammonds Dep., R. 52 at 45–46, and because the cheerleading team is entirely self-funded, this fundraising revenue did not offset any expenses that the Board would have otherwise had to incur.

By contrast, this is not a case in which the Board acted like a for-profit venue by renting its space to a private cheerleading competition in exchange for part of the admission fees. *Cf. Sawaya v. Tucson High Sch. Dist. No. 1*, 281 P.2d 105, 106 (Ariz. 1955) (holding that a school district engaged in a proprietary function when it directly profited from renting a stadium to other schools for interscholastic football games); *see also Kootsillas v. City of Riverview*, 543 N.W.2d 356, 358 (Mich. Ct. App. 1995), *aff'd*, 564 N.W.2d 45 (Mich. 1997) (holding that a state agency engages in a proprietary function when it charges fees in excess of amounts needed to offset related expenses). And the Board did not play any part in hosting the cheerleading competition itself. Instead, the Board only provided the space necessary for the Boosters Club and Cheer Elite to run their event. *Accord Comair, Inc. v. Lexington-Fayette Urban Cnty. Airport Corp.*, 295 S.W.3d 91, 101–02 (Ky. 2009) (rejecting the broad characterization of a county airport board as engaging in the proprietary function of

9

"transportation" because the board provided only the "runways, terminals, and other infrastructure that private airline companies" use for a fee). Absent evidence that the Board intended to raise revenue or to participate in a commercial market, there is no "genuine dispute of material fact" that the Board engaged in a governmental function entitling it to immunity. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)); *see also Prater*, 292 S.W.3d at 888 (holding that a board of education's provision of housing on school premises for its night watchperson was governmental because the board's purpose was "not to raise revenue or to participate in the local housing market").

This conclusion does not mean that Brabson cannot recover for her injuries. The Kentucky General Assembly created the Board of Claims as a partial waiver of immunity for negligently performed governmental functions. Ky. Rev. Stat. § 44.070(1); *see, e.g.*, *Williams v. Ky. Dep't of Educ.*, 113 S.W.3d 145, 154 (Ky. 2003) ("In enacting the Board of Claims Act, the General Assembly exercised its authority under Sections 230 and 231 of our Constitution to partially waive immunities enjoyed by otherwise immune entities."). Brabson is well aware of this administrative scheme: she has a parallel action for this same injury currently pending before the Board of Claims. R. 14-1; R. 21 at 2.

Instead, she argues that the Board of Claims "will not adequately compensate" her because relief before the Board of Claims is statutorily limited. Brabson cannot, for example, receive damages for pain and suffering, and any award of compensation will be offset by any third-party benefits she received, such as medical insurance. *See* Ky. Rev. Stat. § 44.070(1). Although this may seem unfair when compared to the broader scope of recovery available in a courtroom, the Kentucky Constitution gives the General Assembly authority to "direct in what manner and in what court suits may be brought against the

Commonwealth." Ky. Const. § 231.  The Court has no power to permit Brabson's suit to proceed here simply because she believes that the General Assembly's administrative scheme is unfair.

## CONCLUSION

Accordingly, it is **ORDERED** that:

(1) The Board's motion for summary judgment, R. 31, is **GRANTED**.  Judgment is entered in favor of defendant Floyd County Board of Education on all claims asserted in Brabson's complaint.

(2) Brabson's pending motion to exclude the testimony of architect William B. Richardson, R. 40, is **DENIED AS MOOT**.

(3) The Clerk shall **STRIKE** this case from the Court's active docket.

(4) The Court will issue a separate Judgment contemporaneously with this Memorandum Opinion and Order.

This the 30th day of May, 2012.

Signed By:
*Amul R. Thapar* AT
United States District Judge